# WHEELING.

24   327
38   134

## SPANG v. ROBINSON.

Submitted January 26, 1884—Decided May 3, 1884.

1. Under the fifth section of chapter 141 of the Code a commissioner may in the manner prescribed by that section compel the debtor to convey his real estate lying out of this State to satisfy the creditor's judgment; but he is not authorized to compel the debtor to execute an assignment of his chose in action for such purpose.  (p. 332.)

2. If he does compel in the manner prescribed by that section such an assignment of his chose in action by the debtor, the courts will hold, that such assignment was made under duress, and it will be held either absolutely void or at least voidable.  (p. 335.)

3. Section 3 of chapter 141 of the Code and sections 11 and 12 of chapter 139 prescribing limitations to the time, in which executions may issue on a judgment, apply alike to judgments obtained before and to those obtained since this Code went into operation.  (p. 339.)

4. If an appellant has copied into the record portions of the record in the court below, which are immaterial to the determination of the matter involved in the appeal, this Court will as a general rule not vary its decree or judgment on that account or give any direction to the clerk in reference to taxing the costs in such a case, as this Court as a general rule leaves it to counsel to determine what parts of the record of the court below should be copied.  But if this privilege of counsel is so abused, that there is copied into the record presented to this Court a large amount of matter, which is obviously immaterial and can have no weight in determining the matters in controversy on the appeal, the Court will correct such abuse by varying its decree or judgment or by giving instructions to the clerk as to the taxation of costs ; and if the record has been so unnecessarily increased, this Court in such an extreme case will at the instance of the appellee apply a similar correction.  (p. 340.)

GREEN, JUDGE, furnishes the following statement of the case:

At the February term 1856, of the county court of Ohio, Charles F. Spang and James McAuley, partners under the name of Spang & Co. recovered of James H. Robinson one thousand and sixty-one dollars and twenty-nine cents, with interest thereon from November 30, 1853, till paid and four-

teen dollars and seven cents costs. A writ of *fieri facias* issued on this judgment, and the plaintiffs wishing to ascertain the estate, on which said *fieri facias* was a lien propounded certain interrogatories to the defendant on September 26, 1867; and thereupon George B. Caldwell, a commissioner, issued a summons to said defendant to answer these interrogatories returnable at his office on September 28, 1867, on which day the defendant, James H. Robinson, answered these interrogatories on oath. In this answer he said he had no real estate or interest in any real estate outside of the State of West Virginia, and that he had a demand against the estate of Wm. T. Robinson, deceased, for money loaned him in his lifetime and for his liabilities assumed by the defendant to the amount of thirty-two thousand and fifteen dollars and forty-five cents with interest, and that he had instituted a chancery suit in the circuit court of Ohio county, West Virginia, for the recovery of said demand. There were other statements in this answer not necessary to be mentioned. Failing to make a conveyance of his property, which the commissioner seems to have thought the law required, though it did not, the commissioner thereupon issued a writ to the sheriff of Ohio county commanding him to arrest said defendant, till he should make such conveyance, and thereupon being in arrest the defendant made an assignment under his hand and seal dated September 28, 1867, whereby he assigned to the sheriff of Ohio county all his right, title and interest to his said claim against Wm. T. Robinson, deceased, and also another small claim not necessary to state, in trust to secure the said judgment in favor of Spang & Co. Upon the execution of this assignment, said commissioner released him from confinement and made his report of these facts to the judge of the said circuit court of Ohio.

The chancery suit for the recovery of this claim brought by James H. Robinson in the circuit court of Ohio mentioned in his answer to these interrogatories, was instituted in February 1866, and was brought against Elijah Day, administrator of Wm. Tate Robinson and others. This suit was pending many years, and the record of it is very voluminous, that part brought before us occupying three hundred and

seventy-four manuscript pages ot the contents of which it is unnecessary to state anything except a small portion of a decree rendered in said cause on February 9, 1882, in which it was decreed, that the plaintiff, James H. Robinson, recover of the defendant, Elijah Day, administrator of Wm. T. Robinson, five thousand four hundred and sixty-four dollars and seventy-eight cents with interest from March 1, 1879, till paid, to be paid out of a fund in the hands of George Robinson, a special receiver in this cause. At another term of the court April 28, 1882, Spang and McAuley, partners under the name of Spang & Co. filed what is called a petition in this cause setting out the facts above stated in reference to this judgment of Spang & Co. against James H. Robinson and the proceedings above stated thereon including said assignment of said claim to the sheriff of Ohio county to secure their said judgment; and they say, they always intended to bring their claim to the attention of the court in due time and as soon as said J. H. Robinson established his claim to the satisfaction of the court; but this decree recognizing his claim entered February 9, 1882, was made at a special term of the court and neither the petitioners nor their counsel knew of said term or had any notice thereof till it ended. They asked that the payment to be made by George Robinson, receiver, should be enjoined, until they could prove their said decree, that it might be paid by the receiver to them and for general relief. The injunction asked was awarded.

On September 8, 1882, Spang & Co. filed an amended petition. It states, that a *fi. fa.* was issued on their said judgment February 19, 1856, and was returned April 7, 1856, "no property found;" that a second writ was issued on said judgment and was returned October 29, 1867, "no property found;" and that a third writ was issued on this judgment and was returned on February 25, 1868, "no property found." On February 10, 1868, a summons was issued from this Court and served on Lamb & Paul, garnishees, to answer a suggestion in writing that by reason of the said *fi. fa.* there was a lien on a liability from them to the defendant; and three other suggestions on other executions in favor of others against J. H. Robinson were issued and served on Lamb &

Paul; that they are informed that James H. Robinson agreed with Alfred Caldwell to pay off three judgments in favor of other persons and also the costs of this suggestion made by Spang & Co.; that this was done, A. Caldwell, the attorney of petitioners, agreeing to take on their claim only the costs of the suggestion, on the plea of Robinson that he needed the money, and that the assignment mentioned in said petition abundantly secured the payment of Spang & Co.'s judgment, interest and costs; that Robinson never questioned the validity of this assignment, and relying thereon the petitioners never sued out another execution after the last one above named. They ask that this and the original petition may be answered under oath, and for the same relief as asked for in the first petition. Demurrers to these petitions were overruled; and James H. Robinson filed an answer to them, the petition and answers being both sworn to. The death of James McAuley was suggested and the suit abated as to him. The defendant, James H. Robinson, in his answer admits the facts stated in the original petition except the statement, that the debt of Spang & Co. had not been paid, and he knows nothing about the professed ignorance of the petitioners and their counsel as to the holding of the special term of the court, at which the decree in his favor against the estate of William T. Robinson was entered. He says, that the allegations of the second petition are true, except that it is not true, that the suggestion served on Lamb & Paul was released without the judgment in favor of Spang & Co. against him having been paid; but on the contrary his recollection is, that this judgment was paid by Lamb & Paul. He denies positively, that any such arrangement as is named in the amended petition was ever made between himself and Alfred Caldwell or that he ever said, that the petitioner's claim was abundantly secured by the assignment of said claim against William T. Robinson's estate. Nothing of the sort ever occurred between him and Alfred Caldwell. He made no plea or request in reference to this suggestion or to the payment to him of any part of the money held by Lamb & Paul, and no agreement or representation was made on the subject. He says, that he always did and does now question the validity of this assignment. He relies on the statute of

limitations to bar said judgment and assignment, and says this assignment is void, it having been made under duress. This answer was replied to generally.

The only deposition taken was that of G. B. Caldwell, which proves, I think, satisfactorily, that his father, Alfred Caldwell, the attorney of the plaintiffs, never collected this judgment; but it fails to prove that any arrangement of any sort was made by James H. Robinson and Alfred Caldwell, the attorney for the petitioner, and contains no confirmation or any admission of validity by James H. Robinson of this assignment to the sheriff. This evidence will be given more in detail in the opinion.

On May 14, 1883, the injunction was dissolved by the court, and the petition and amended petition were dissmissed; and it was decreed, that James H. Robinson recover against Charles F. Spang his costs incurred in this litigation arising out of said petition, and it made suitable provision for paying to James H. Robinson the amount in his hands which by former decree was adjudged to belong to J. H. Robinson. From this decree Charles F. Spang has obtained an appeal and *supersedeas* from this Court.

*Caldwell & Caldwell* for appellant.

*H. M. Russell* and *W. W. Arnett* for appellee.

GREEN, JUDGE.

The determination of this case depends on the true meaning of chapter 188 of the Code of Virginia (see edition of 1860 p. 777) as to the power of the commissioner to compel a judgment-debtor, who in answer to interrogatories has stated that he owned a chose in action, to assign it by a written assignment under his hand and seal to the sheriff of the county, in whose hands is the *fieri facias*, in trust for the use of the plaintiff in such execution to the extent of his judgment, interest and costs, the residue of the moneys arising from the chose action when collected by the sheriff to be paid to the debtor, who executed such assignment under seal. This chapter 188 of Code of 1860 has in all material respects so far as it affects this cause remained in force

from 1849 to the present time both in Virginia and in West Virginia, being substantially the same in these respects as chapter 141 of the Code of West Virginia; and the members of the bar in both States are familiar with the mode of proceeding thereunder. It is explained by Professor Minor in the first edition of his Institutes on pages 842 and 843 of vol. 4.

The object of filing the interrogatories to the debtor under section 5 of chapter 188 of Code of Virginia or section 4 of chapter 141 of Code of West Virginia is stated on the face of these sections: "To ascertain the estate, on which *a writ of fieri facias* is a lien, and to ascertain any real estate in or out of this State, to which a debtor named in such *fieri facias* is entitled." When such real and personal estate including choses in action have been discovered by answers to such interrogatories, inasmuch as the creditor can have no means of enforcing his judgment in this State against the lands of the debtor in other States, unless the creditor make a conveyance thereof for his benefit, § 6 of ch. 188 of Code of Va. of 1860 or §5 of ch. 141 of Code of W. Va. provides, that such debtor may be compelled to convey said land to the officer, in whose hands the *fieri facias* has been or is; and if he refuses to make such conveyance, he can be imprisoned till he does make such conveyance. But there exists no necessity for permitting or allowing such commissioner to compel the debtor to convey or assign either personal property or choses in action, as this chapter provides for the creditor other and simpler modes of getting such personal property appropriated to the payment of his execution; and such choses in action as to visible personal property and bank-notes or money were to be delivered to the same officer who had held or still held such *fieri facias;* or as that might be troublesome, when such visible personal property was in a remote part of the State, the commissioner might order it to be delivered to some other officer and might prescribe the manner of it delivery; and all this he could compel the debtor to do by imprisonment, if necessary. When thus delivered the court might order the property to be sold under an order of the court and proper application of the proceeds to be made    See sec. 9 of ch. 188 of Code of Va. of 1860 or sec. 8 of ch. 141 of Code

of W. Va.   Provision is likewise made for the sale and dis-
position of the proceeds of real estate lying out of the State,
which has been so conveyed by the debtor.   No provision is
made for the enforcement of the sale of the land in the State.
The primary object of this mode of proceeding being simply
to discover on what property the *fieri facias* was a lien.
When this was done, except in cases where the general law
furnished no sufficient remedy to the plaintiff in the execu-
tion, no remedy was specially provided for him in this chap-
ter; and therefore as the law provided proper modes for sub-
jecting real estate lying in this State to the payment of a
judgment, when the answers to the interrogatories discovered
that the debtor owned real estate in the State, the plaintiff was
left to enforce his judgment against it by a writ of *elegit*, while
it was in force, or by a suit in chancery since its abolition.

If the defendant in the execution in his answers to the
interrogatories disclosed that he had *evidences* of debt or other
*choses in action*, what was it the duty of the commissioner to
do in regard to them?   The answer under section 6 of chap-
ter 188 of Code of Virginia of 1860 or section 5 of chapter
141 of Code of West Virginia is clear.  He should order them
to be delivered by the debtor to the sheriff or other officer
just as any other personal property was to be delivered;  and
he might, as in the case of visible property, compel the deliv-
ery of such evidences of debt, bonds, notes or even open
accounts by imprisonment of the debtor, if necessary.   But
it seems to me obvious, that he could not compel such debtor
to assign either by a writing not under seal or by a writing
under seal or by an endorsement of any such bond or note
or in any other manner such chose in action to such officer.
The delivery of such bond, note or open account was not
intended to transfer such chose in action to the officer but
was intended simply to confer on him an authority for sixty
days to collect such chose in action.  Or more properly speak-
ing it was intended to authorize the person, who owed the
debtor as shown by such chose in action, to pay it to the
sheriff or other officer for a period of sixty days and only for
that period, for at the end of sixty days the sheriff or other
officer was and is bound to return such chose in action, evi-
dence of debt or other security, which may remain in his

hands, to the clerk's office of the court, from which the *fieri facias* issued. This appears to me to be clearly the true meaning to be deduced from sections 8 and 10 of chapter 188 of Code of 1860 and sections 5 and 9 of chapter 141 of Code of West Virginia. When this chose in action was returned to the clerk's office in sixty days, he having no title to it by assignment or otherwise and having no authority to collect it any longer, the creditor's mode of collecting it is clearly pointed out and provided for in sections 11 and 15 of chapter 188 of Code of Virginia of 1860 and in sections 10 and 14 of chapter 141 of Code of West Virginia. But as certain property, to which a debtor had a claim, or certain choses in action could not be appropriately enforced by these proceedings by suggestion, section 16 of chapter 188 of Code of Virginia of 1860 and section 15 of chapter 141 of Code of West Virginia provide for the recovery of such choses in action and such personal property by the appropriate suits in law or in equity.

Chapter 188 of Code of Va. of 1860 and chapter 141 of Code of W. Va., were intended obviously not to confer any new rights on the execution-creditor, except in the single case, where the debtor's land lay out of the State, but was intended simply to enable him to compel the execution-debtor to discover on oath what the creditor had a lien upon, and then to permit him to enforce his lien in modes provided by the common law or by statute. But it was not intended by this act to authorize the commissioner to compel the debtor under the penalty of imprisonment to execute any assignment or paper of any sort conferring new rights upon the creditor, except in the single case where he had lands outside of the State, which the commissioner might compel him to convey.

The commissioner therefore in this case had no right to compel Jas. H. Robinson to execute the assignment under seal dated September 28, 1867, to the sheriff of Ohio county conveying "all his right, title and interest in and to the claim which he had against Wm. T. Robinson, deceased, as *per* his answer to the second interrogatory," which was that he had "a demand against the estate of Wm. T. Robinson, which is for money loaned him in his lifetime and for his liabilities

assumed by James H. Robinson to the amount of thirty-two thousand and fifteen dollars and forty-five cents." This assignment states on its face that it was to secure Spang & Co. the payment of their judgment against Jas. H. Robinson with interest thereon and costs of suit. That the assignment was made under *duress*, appears on the face of the commissioner's report filed with the petition of Spang & Co. For it says: "Said James H. Robinson appeared as required (to answer the interrogatories propounded) and failing to make conveyance of his property as required by law, which property is specified in his answers to said interrogatories (which answers showed he had no real estate out of this State), your commissioner therefore issued a writ to the sheriff of Ohio county, hereto annexed, commanding said defendant's arrest till conveyance as aforesaid should be made. Thereupon said defendant made said conveyance as annexed hereto; and a writ of release was issued by me the commissioner." This conveyance referred to is this assignment; and it was evidently made, while James H. Robinson was falsely imprisoned to compel such conveyance, and of course was made under duress. It is claimed, that though executed under duress it was not void but only voidable, and it was afterwards voluntarily confirmed. We deem it unnecessary to consider whether this assignment was absolutely void or only voidable and capable of confirmation subsequently; for in point of fact it never was confirmed.

The amended petition of Spang & Co. was, I suppose, designed to allege that this assignment was afterwards confirmed; if we admit that it did so allege, the answer of James H. Robinson was certainly a positive denial of such affirmation. But one deposition was taken to prove this confirmation; and it wholly fails to do so. It is the deposition of George B. Caldwell. He proves only that on February 10, 1868, his father as attorney for the plaintiffs in four judgments, which had been obtained by different parties against James H. Robinson, issued four several suggestions, that Lamb & Paul had funds in their hands belonging to James H. Robinson; that one of these four suggestions was upon the *fieri facias* sued out of the clerk's office of the circuit court of Ohio county by Spang & Co. against James H. Rob-

inson for one hundred and six dollars and twenty-nine cents with interest thereon from November 30, 1853, till paid and seventeen dollars and forty-eight cents costs. On the back of the summons to Paul & Lamb on the suggestion were receipts by the sheriff, clerk and commissioner for costs in this case received of Alfred Caldwell amounting in all to ten dollars and nineteen cents. There was no other endorsement on this summons. But on another were the names of the plaintiffs in the judgments, on which these suggestions issued, and opposite each name the amount of the several judgments and costs and then these words, " costs of suggestion in *Spang & Co.* v. *James H. Robinson* six dollars and fifty cents." And these four amounts were added together making an aggregate of nine hundred and forty-one dollars and eighty cents. G. B. Caldwell proves, that this endorsement was made in violet ink in the hand-writing of Lamb, which he knew well. Lamb is living, but his deposition was not taken, George B. Caldwell testifying that he could remember nothing of the transaction; and the other member of the firm of Paul & Lamb was dead.

Admitting that this with other matters deposed to prove that Lamb & Paul out of the funds in their hands belonging to James H. Robinson paid off the three other judgments of other parties, on which these summons to answer suggestions issued, and that he paid on this judgment in favor of Spang & Co. only the costs of the suggestion, this certainly would not tend in the least to prove that James H. Robinson confirmed this assignment of an entirely different claim made about a year before to the sheriff of Ohio county to satisfy this judgment of Spang & Co. On the contrary it looks very much as if Alfred Caldwell, the attorney of Spang & Co., knew that the proper way of getting payment of this judgment of Spang & Co. out of the choses in action of the debtor, James H. Robinson, was by issuing summons on suggestions as provided by the statute. But it is attempted to be helped out in the deposition of George B. Caldwell by his saying: " At that time Alfred Caldwell, deceased, told me, that Mr. James H. Robinson had asked him not to require him to pay the whole of the said four judgments out of the money in the hands of Lamb & Paul; and Alfred Caldwell, deceased,

had upon such representation by Robinson agreed to receive the amount of the other three judgments, interest and costs, and the cost of the suggestion in the case of Spang & Co. from Lamb & Paul and dismiss the suggestion for the money due to Spang & Co., until it should be realized in the cause of *James H. Robinson* v. *Elijah Day, administrator, et al.*" And he adds, "I find by the record, that on March 3, 1878, on the motion of the plaintiffs these four suggestions were dismissed." The stating of this conversation by the witness with his father, Alfred Caldwell, was objected to by the counsel for James H. Robinson; and as a matter of course it was not evidence. being mere hearsay. But if it had been deposed to by Alfred Caldwell, it would not even tend to show that James H. Robinson had confirmed this assignment made to the sheriff about a year before, or that either party thought of it. The natural inference would be that if necessary Spang & Co., by their counsel, Alfred Caldwell, expected to make this money. out of the fund coming to James H. Robinson in this last named cause by suggestion, if he did not pay it as he promised to do.

The only other evidence offered to prove a confirmation of this assignment by James H. Robinson was the statement of the witness that he never at any time intimated to the witness his unwillingness to pay Spang & Co. out of whatever he might recover in his suit against James H. Robinson's estate, though he was his counsel in that case. This surely does not even tend to prove that Robinson ever confirmed this assignment. It seems to show rather that, so far as is known, Robinson said nothing about it and was never called upon to say anything about it. If indeed it had been proved, which it has not, that he did expect to pay off this judgment of Spang & Co.'s out of this claim against the estate of W. T. Robinson, it would amount to nothing as a confirmation of this assignment to the sheriff. I am therefore of opinion, that it is clear, that the appellant had no claim, which can be based on this assignment of James H. Robinson to the sheriff. It seems to be idle to refer to authorities to show that the assignment was made under duress and was not binding on James H. Robinson. But I may refer to what is said in *Porter* v. *Daniels*, 11 W. Va. 253–4, and the various

authorities there referred to, which establish, that bonds therein mentioned were invalid because "executed to avoid imprisonment by the officers or other penalties to which the party was not legally liable."

The only question remaining to be considered is: Was the lien on all the choses in action of the debtor, James H. Robinson, created by the last execution returned on February 25, 1868, barred when this proceeding, which may be regarded as a proceeding to enforce such lien, was instituted. It was clearly barred, if section 3 of chapter 141 of Code of W. Va. applies to judgments rendered before this Code went into effect. For its language is: "The lien required under the preceding section" (which is precisely the same as the like section in the Code of 1849) "shall cease whenever the right of the judgment-creditor to levy the writ of *fieri facias,* under which said lien arises, or to levy a new execution, or his judgment ceases or is suspended by an undertaking being given and forfeited or by an appeal or otherwise." The only change in this section from that in the Code of Virginia is that the words "or otherwise" are substituted for "or other legal process." But this, as is shown in the case of *Werdenbaugh* v. *Reid et al.,* 20 W. Va. 599, is a most important change.

"By this third section of chapter 141 of Code of W. Va. the lien of a *fieri facias* ceases, whenever the right to levy any execution, which may be sued out on the same judgment, ceases, and the right to levy cannot exist after the right to sue out a *scire facias* on the judgment is barred. This bar is fixed by sections 11 and 12 of chapter 139 of the Code of 1869 at ten years, when no execution has ever been issued on the judgment; consequently the right to levy any execution in such case must cease after ten years from the date of the judgment, and by the statute the lien of a *fieri facias* must cease at the same time."

The above is a quotation from the above case in 20 W. Va. 599, which was maturely and carefully considered by the Court, and which I am disposed to follow without going over the grounds we then went over.

In this case executions did issue; and the limitation of time fixed for the issuing of other executions in this case is fixed by section 11 of chapter 139 of Code of W. Va., which

declares: "When execution has issued, other executions may be issued on such judgment without notice within ten years from the return day of the last execution issued thereon, on which there is no return by an officer, or which has been returned unsatisfied." Of course under this section no execution could have issued on the judgment in this case, when these proceedings were commenced, as nearly fourteen years had elapsed since the return of the last execution unsatisfied. But it is insisted that these provisions of the Code of West Virginia do not apply to any case, when the judgment was rendered before the Code of West Virginia took effect. It cannot be disputed that these provisions in the Code of West Virginia do apply to judgments rendered before the Code went into effect, if it clearly appears from the Code of West Virginia, that the Legislature intended them to apply to cases of judgments rendered before the passage of the Code of West Virginia. The Code of 1849' gave the plaintiff twenty years from the return day, on which there was a return by the sheriff, in which to issue another execution. Now the Legislature has the constitutional right to reduce this time not only in reference to future but also in reference to past judgments. This is undisputed. See *Huffman* v. *Alderson*, 9 W. Va. 624.

Now in this case the Legislature has clearly shown, that it intended to reduce the time, in which execution should be issued, when another execution had been returned unsatisfied, from twenty to ten years, and intended to apply this to judgments rendered before the Code of West Virginia took effect, as well as to those rendered after. This is shown beyond doubt by section 12 of chapter 139 of Code of W. Va. which provides that "no execution shall issue on any judgment in this State after the time prescribed by the preceding section" (from which we quoted above) "except that in computing the time the period mentioned in section 4 of chapter 136 shall be omitted." The time is from April 17, 1861, to March 10, 1865. Of course therefore these provsions of the court were necessarily intended to be applied to judgments rendered before the passage of the Code and even to judgments rendered before the war. Clearly therefore no execution could be issued on this judgment of *Spang & Co.* v. *James M.*

*Robinson*, when these proceeding were instituted, as nearly fourteen years had elapsed since the return of the last execution, whereas the limit fixed by the law applicable to this judgment was ten years after the return of the last execution. This being settled section 3 of chapter 141 of the Code, which we have quoted, expressly declares that the lien of this *fieri facias* on this judgment ceased, when the right to levy a new execution ceased in any manner; and it ceased of course, when no new execution could be sued out, that is some four years before the appellant commenced these proceedings to enforce the lien created by these *fieri facias*.

These principles, as I understand them, were the basis of the decision by this Court in *Werdenbaugh* v. *Reid*, 20 W. Va. 588. These provisions of the Code were then applied to a case, in which the judgments were rendered long before the Code went into effect; and I really do not regard this as now an open question in this State. But as the counsel do not seem to regard it as closed by this decision of *Werdenbaugh* v. *Reid*, I have thought proper to make the remarks I have. The bar of the statute of limitations relied upon in the defendant, Robinson's, answer is a complete bar to any recovery, if the plaintiff can be regarded as basing his claim on the lien created by the *fieri facias* he had issued on his judgment against Robinson; and if his case is rested, as by the pleadings it seems to be, on the assignment for the use of the appellant executed by Robinson to the sheriff of Ohio county, it is of no avail, as it was procured by duress and has never been confirmed, if indeed it could be.

The natural conclusion from this would be that the final decree of the circuit court appealed from should be affirmed, and that the appellee should recover of the appellant his costs in this Court expended and thirty dollars damages. But there are in this case certain peculiar circumstances, which would render such a decree unjust to the appellant. When he had the record copied, he had copied as a part of it a part of the record in the old suit of *James H. Robinson* v. *E. Day, administrator of W. T. Robinson et al.*, amounting to about two hundred and twenty manuscript pages, and of these there was no sort of necessity to copy into the record more than a small part of the last decree rendered in said

cause on February 9, 1882, and referred to in the appellant's petition. But after the record in this case was copied, including this large amount of matter taken from this old suit and throwing no sort of light upon the question involved in this suit, the counsel for the appellant notified the counsel for the appellee that he had omitted certain portions of this record of this old suit and that he would present the record, as it had been made out. The appellee's counsel then notified the appellant's counsel, that he regarded much of the record, as it had been made out under the direction of the appellant's counsel, "as not material to the determination of the questions involved in the appeal about to be applied for, but if such portions are to be presented to the Supreme Court of Appeals, it will be material to have before that Court certain additional portions of said record," which he then specified, extending over about one hundred and fifty pages of the manuscript record; and accordingly the appellant's counsel directed the clerk to copy these one hundred and fifty additional pages. They were as utterly useless and immaterial as the two hundred and twenty pages of immaterial matter which the appellant's counsel had inserted. Thus this record contains three hundred and seventy manuscript pages of unnecessary and improper matter. The appellant has been charged with the copying and printing of all this useless matter, none of which has this Court read or considered. The whole record in this case, including everything which is at all pertinent, would not exceed one hundred and eighty-five manuscript pages; but as presented to us it contained four hundred and fifty-five manuscript pages. Now while this Court leaves it in a great measure to counsel to determine, what portion of the record has any pertinency to the matter to be brought before us on an appeal, and never has required in the taxing of the costs any part of the actual costs to be omitted, nor varied its judgment or decree because of any unnecessary matter brought into the record, yet in this case it is so apparent that all the matter, which we have spoken of, was utterly impertinent, and as a result of this the appellant because of his own fault has paid a large amount of unnecessary costs; yet this amount has without the least necessity been largely increased by the appellee's

requiring one hundred and fifty pages of manuscript matter to be copied and printed by the appellant, and he has thus increased through this fault of the appellee's counsel an expense exceeding thirty dollars damages usually allowed the appellee, when a decree is affirmed in such a case as this.

Under these circumstances, I think, justice to the appellant requires, that instead of awarding as damages to the appellee the usual sum of thirty dollars damages, we should allow him only one cent damages and his costs in this Court. In so doing the appellant will bear the largest portion of the expenses unnecessarily incurred in this cause, which is but right, as he was the first and principal offender in this matter. But the appellee's counsel, who is also in fault though in a less degree, will be made in effect to bear a portion of these useless expenses, as I think he should be, because much blame attaches to him for the incurring of a portion of these utterly useless costs. In the argument before this Court the appellant insists on the pertinency of these two hundred and twenty pages of manuscript taken from the old suit, which he had copied into the record, because in his judgment it shows, that the appellee had acted dishonestly in other matters in no manner connected with the subject-matter of controversy in this appeal, from which he draws the conclusion, that he had a dishonest character. Evidence of his dishonest character in other transactions could not as a matter of course be used against him in this cause for the most obvious of reasons, that, if this was allowed, the Court would be required in each case to determine, whether he had acted dishonestly in these other transactions, and this would render it necessary in the decision of one case to investigate and decide innumerable other cases; for without so doing we could not know, whether the party had acted dishonestly in these other transactions. They were *res inter alios acta* and not to be regarded as evidence. Moreover, as the opinion I have expressed shows, that the case before us involved only the decisions of mere questions of law and depended in no degree upon the question, whether the appellee, James H. Robinson, was or was not an honest man, there was no excuse for the appellant introducing the immense quantity of evidence taken from another suit

to prove, that he was a dishonest man.   Still more clearly was all this matter of such a character, that it could not be read by this Court, inasmuch as it appeared that Spang & Co. were not parties to the suit, from which all this immaterial matter was copied by the appellant's counsel into the record of this case.   The appellee's counsel justifies his course in introducing this large amount of immaterial matter into the record as necessary in order to rebut the proof of the dishonesty of his client, which might be contained in that part of the record copied by the appellant.   Now these matters, which the appellant's counsel had copied into the record were obviously so utterly immaterial, that the appellee's counsel, it seems to me, could not but know that they would be neither read nor considered by this Court; and there was therefore no sort of necessity or propriety in rebutting them in any way, much less by the copying into the record a great mass of immaterial matter, which appellee's counsel, if he thought at all, must have known that this Court would neither read nor consider.   It is true the judge, who granted this appeal, was compelled to read this mass of useless matter, for, as it preceded the record proper in this case, he could not, till he had read it at least in part, know that it really had nothing to do with the appeal asked for but would naturally take it for granted it had.   The appellee's counsel cannot therefore be excused for requiring those one hundred and fifty manuscript pages to be copied into the record, they being so obviously immaterial, and therefore, as the appellant has by reason of this had to pay a large amount of costs unnecessarily, he ought not to be required to pay the usual damages of thirty dollars, and instead of thirty dollars the appellee in this cause should be awarded one cent damages and his costs.

The decree of the circuit court of May 14, 1883, must be affirmed; and the appellee must recover of the appellant his costs in this Court expended and one cent damages.

AFFIRMED.